# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 24-1931

———————————————————

Leslie Torgerson

*Plaintiff - Appellant*

v.

Roberts County of South Dakota; Tyler Appel, in his individual and official capacities; Zachary Angerhofer, in his individual and official capacities; Wesley Bowsher, in his individual and official capacities; Ross Torgerson; Terri Torgerson

*Defendants - Appellees*

————————

Appeal from United States District Court
for the District of South Dakota - Northern

————————

Submitted: January 15, 2025
Filed: June 3, 2025

————————

Before SMITH, BENTON, and ERICKSON, Circuit Judges.

————————

SMITH, Circuit Judge.

Leslie Torgerson filed suit in federal district court against Roberts County, South Dakota (County); County Sheriff Tyler Appel, in his individual and official capacity; County Deputy Zachary Angerhofer, in his individual and official capacity;

County Deputy Wesley Bowsher, in his individual and official capacity; adopted son Ross Torgerson (Ross); and ex-wife Terri Torgerson (Terri) (collectively, "defendants"), alleging violations of Torgerson's substantive and procedural due process rights under the Fourteenth Amendment and civil conspiracy. Torgerson additionally asserted a *Monell*[1] claim against the County; a state-law claim for common law battery against Ross; and a state-law intentional-infliction-of-emotional distress claim against Deputy Angerhofer, Deputy Bowsher, Ross, and Terri. All the claims arise from a domestic dispute between Torgerson, Ross, and Terri. The defendants moved for summary judgment on Torgerson's claims. The district court[2] granted the defendants' motions for summary judgment and declined to exercise jurisdiction over the remaining state-law claims. Torgerson appeals. We affirm.

## I. *Background*[3]

Torgerson and his then-wife Terri resided together in Sisseton, South Dakota. On September 21, 2021, their adult son Ross visited the residence to discuss family matters. Torgerson and Ross began fighting. According to Torgerson, Ross attacked him after Torgerson demanded that Ross leave the home for being intoxicated, and Torgerson lost consciousness after the altercation. By contrast, Ross claims that Torgerson charged him and Terri after Ross accused Torgerson of infidelity; Ross asserts that he subdued Torgerson to protect Terri from Torgerson.

---

[1]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

[3]We recount the facts in the light most favorable to Torgerson as the non-moving party. *See SBFO Operator No. 3, LLC v. Onex Corp.*, 101 F.4th 551, 556 (8th Cir.), *cert. denied*, 145 S. Ct. 547 (2024).

Terri called the County Sheriff's Office, and Deputies Angerhofer and Bowsher arrived shortly thereafter.[4] Ross had previously worked as a tribal police officer. He did not know Deputy Bowsher during his service. But Ross's and Deputy Angerhofer's "paths ha[d] crossed a few times prior to" the events of September 21, 2021. R. Doc. 40-5, at 2.

Upon his arrival, Deputy Angerhofer observed Torgerson lying on the floor underneath a table next to a window. Deputy Angerhofer could not discern Torgerson's level of consciousness and asked him to stand; Torgerson did not respond. Deputy Angerhofer saw blood around Torgerson's right ear. Deputy Angerhofer called for emergency services. When he could communicate with Torgerson, he advised Torgerson not to get up. Torgerson, however, did stand up prior to emergency services arriving. Deputy Angerhofer instructed Torgerson to grab a towel that was located behind him because Torgerson "was spitting . . . what [Deputy Angerhofer] believed to be blood." R. Doc. 43-11, at 8. Deputy Angerhofer radioed dispatch that Torgerson was "bleeding from his right ear," "ha[d] a bruise on his right forehead, [and] sa[id] he might have lost a tooth." *Id.* at 9.

Deputy Bowsher spoke to Ross outside of the residence while Deputy Angerhofer remained with Torgerson. Initially, Torgerson said that Ross assaulted him and that he wanted to press charges. He told Deputy Angerhofer that he "didn't touch [Ross]." *Id.* When Ross reentered the residence, he identified the table Torgerson's head hit when he fell. Thereafter, Torgerson changed his mind about wanting to press charges against Ross, stating "I don't want Ross charged so you can charge me." *Id.* at 11. Ross responded, "I'm not charging you, Dad." *Id.* at 12. Torgerson replied, "Charge me." *Id.* Deputy Bowsher then explained, "With a domestic, it's not anyone pressing charges. It's the State pressing charges." *Id.*

---

[4]Video from the deputies' body cameras shows the deputies' interaction with Torgerson, Ross, and Terri.

Deputy Angerhofer decided to "go long form" on the investigative report. *Id.* at 13. According to Deputy Angerhofer, "long form" means that the officers

> take all the information [they] obtained from [their] investigation or [from] being on scene, and [they] . . . put it into a report and send it off to the state's attorney for their disposition on the matter, i.e., whether or not they want to . . . charge it out as an assault or disorderly conduct or however they see fit for the situation or other situations.

*Id.*

Torgerson advised the officers that he wanted to leave and go to his daughter's home in Fargo, North Dakota. Deputy Angerhofer advised Torgerson that emergency medical technicians (EMTs) would examine him and advise whether he needed to go to the hospital. Torgerson indicated that he "would rather go to Fargo and be checked out there." *Id.* at 15. The EMTs arrived and examined Torgerson.

While the EMTs were examining Torgerson, Deputy Angerhofer asked Deputy Bowsher to speak outside of the residence. The deputies agreed that given the investigatory facts and the men not "want[ing] to press charges against each other," they would forego an arrest. *Id.* at 16. Instead, they would send the report and videos to the state's attorney for review and consideration of whether charges were warranted. The deputies made no arrests that evening.

After conversing, the deputies went back inside the residence and discussed the parties' alcohol consumption. Based on this discussion, Deputy Angerhofer advised that he would give preliminary breath tests (PBT) to Ross and Torgerson. Torgerson's PBT resulted in a 0.017, and Ross's PBT resulted in a 0.091. Ross's PBT raised concern from Deputy Angerhofer with Ross driving himself home. Discussions ensued regarding transportation for Ross. Eventually, Terri drove Ross home, and the deputies left.

Following the incident, Torgerson gathered his belongings and drove to his daughter's house in Fargo, North Dakota. In Fargo, he received medical treatment at a hospital, which included stitches. Torgerson stayed with his daughter in Fargo for the next few days and returned to Sisseton on September 26, 2021. Communication between Torgerson and Terri deteriorated in the days following his return home.

On September 30, 2021, Torgerson returned to Fargo to have his stitches removed. That same day, Terri filed a state petition and affidavit for a protection order against Torgerson. Upon Torgerson's return to Sisseton from Fargo, he found the garage door, which he usually used to enter the home, unplugged. This time, he entered the home through the back door using his house key. Upon Terri's return to the house from filing for the protection order, Torgerson prevented her entry into the home. A brief argument ensued leading to Terri's departure for Ross's home.

The state circuit court granted a temporary protection order, and the County Sheriff's Office served Torgerson with it on October 1, 2021. Several weeks later, on October 27, 2021, the state circuit court held a permanent protection hearing. Terri was represented by counsel, while Torgerson appeared pro se. Ross and Terri testified under oath at the hearing, and Torgerson cross-examined them. Terri's counsel submitted as an exhibit Deputy Angerhofer's September 21, 2021 report. Torgerson did not object to its admission. Although Torgerson had a copy of the deputies' body camera footage from September 21, 2021, he did not submit it as an exhibit. The state circuit court ruled that some kind of confrontation occurred on September 21, 2021, in which Torgerson became angry and Terri felt threatened. The court granted Terri a two-year protection order against Torgerson. Torgerson did not appeal the state-court order.

Later on October 27, 2021, Terri served Torgerson with divorce papers filed in the Sisseton Wahpeton Oyate Tribal Court. Torgerson moved to dismiss the divorce proceeding for lack of jurisdiction. On November 10, 2021, Torgerson's

attorney emailed state court divorce papers to the County Sheriff's Office to be served on Terri. On January 10, 2022, the tribal court denied Torgerson's motion to dismiss the divorce proceedings, concluding that it had jurisdiction. After several attempts, Terri was served with state divorce pleadings on February 14, 2022. The state circuit court, on June 6, 2022, granted Terri's motion to dismiss the state divorce proceedings because the tribal court had jurisdiction. Torgerson appealed the state circuit court's decision granting Terri's motion to dismiss.[5]

On July 19, 2022, the tribal court held the divorce trial. Although Torgerson did not personally appear, his counsel was present to argue that the tribal court lacked jurisdiction. On August 2, 2022, the tribal court entered a judgment and decree of divorce. Torgerson appealed. The tribal appeals court dismissed the appeal as untimely.

On June 10, 2022, Torgerson filed the instant suit in federal district court against the defendants, alleging violations of Torgerson's substantive and procedural due process rights under the Fourteenth Amendment and civil conspiracy. Additionally, Torgerson asserted a *Monell* claim against the County; a state-law claim for common law battery against Ross; and a state-law intentional-infliction-of-emotional distress claim against Deputy Angerhofer, Deputy Bowsher, Ross, and Terri. Terri and Ross filed counterclaims for assault and battery against Torgerson. Terri and Ross filed separate motions for summary judgment, and the remaining defendants, all state actors, filed a joint motion for summary judgment on Torgerson's claims.

_____

[5]After Torgerson filed his appeal in this case, the South Dakota Supreme Court reversed the state circuit court's grant of Terri's motion to dismiss Torgerson's state court divorce proceedings. *See Torgerson v. Torgerson*, 11 N.W.3d 50, 66 (S.D. 2024) (reasoning that "Terri failed to present any evidence to the circuit court . . . to satisfy the jurisdictional requirement of SDCL 1-1-25. Accordingly, we reverse the circuit court's order granting full faith and credit to the tribal court order.").

The district court granted the defendants' motions for summary judgment and declined to exercise supplemental jurisdiction over the remaining state-law claims. The district court concluded that Torgerson failed to state a claim for a Fourteenth Amendment violation because he did not "plead[] that he possessed a constitutional interest, much less that a constitutional interest ha[d] been violated." R. Doc. 67, at 6. Additionally, the court determined that Torgerson's civil conspiracy claim failed because he "fail[ed] to state a constitutional interest" and "fail[ed] to plead facts showing a conspiracy was formed or [that his] membership in a protected class was the reason defendants conspired to violate his alleged constitutional right." *Id.* at 7. Based on its determination that Torgerson "did not plead a constitutional right, much less a violation of a constitutional right," the court concluded that Torgerson's *Monell* claim failed. *Id.* at 8. Finally, the court declined to exercise supplemental jurisdiction over Torgerson's state-law claims and Ross and Terri's state-law counterclaims, concluding that "they [were] comprised wholly of state related issues." *Id.* at 9. Torgerson now appeals.

## II. *Discussion*

On appeal, Torgerson first argues that the district court erred in granting summary judgment to the defendants on his Fourteenth Amendment claim because he "was deprived of his protected liberty interest in an honest investigation . . . . due to the reckless investigation by Deputy Angerhofer, Deputy Bowsher, and Sheriff Appel." Appellant's Br. at 15. Second, Torgerson argues that the district court erred in granting summary judgment to the defendants on his civil conspiracy claim. Third, Torgerson contends that the district court erred in granting summary judgment to the County on his *Monell* claim because he proved "that in 2021 the Sheriff had policies which were contrary to state law." *Id.* at 13. Finally, Torgerson asserts that the district court erred in declining to assert supplemental jurisdiction over his state-law claims "because they form part of the same case and controversy and derive from a common nucleus of operative fact." *Id.* at 14.

-7-

"We review de novo a district court's grant of summary judgment. Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Lamar v. Payne*, 111 F.4th 902, 907 (8th Cir. 2024) (internal quotation marks omitted). We review for an abuse of discretion a district court's decision whether to exercise supplemental jurisdiction. *Stearns v. Wagner*, 122 F.4th 699, 704 (8th Cir. 2024).

## A. *Fourteenth Amendment*

Torgerson argues that he has a "substantive due process cause of action for reckless investigation." Appellant's Br. at 15 (quoting R. Doc. 59, at 38). Torgerson contends that construing the facts in the light most favorable to him, Deputies "Angerhofer and Bowsher attempted to coerce or threaten [him]" by "initially threaten[ing] to place [Torgerson] in handcuffs and arrest him"; telling Torgerson that he "had no say in who is arrested or charged, the State of South Dakota decides that"; and failing to ask Torgerson "his side of what happened." *Id.* at 17–18 (bold omitted). Torgerson also asserts that Deputies Angerhofer and Bowsher "purposefully ignored evidence suggesting Torgerson's innocence," such as evidence that Torgerson sustained "serious injuries that were incurred as a result of Ross." *Id.* at 18–19 (bold and italics omitted). Finally, he argues that evidence exists "of systematic pressure to implicate [him] in the face of contrary evidence," including evidence that "Sheriff Appel and Ross Torgerson have been best friends for a long time." *Id.* at 21 (bold omitted).

In addition to his substantive due process claim, Torgerson alleges that he pleaded a procedural due process claim because the deputies' "failure to investigate the September 21, 2021 assault on [Torgerson], and the failure to fairly report those events[,] denied him due process at the October 27, 2021 [p]rotection [o]rder hearing." *Id.* at 28.

To establish a violation of a substantive due process right, the plaintiff must prove "(1) that [an] official violated one or more fundamental constitutional rights, and (2) that the conduct of the . . . official was shocking to the contemporary conscience." *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (internal quotation marks omitted). To establish a violation of a procedural due process right, the plaintiff must "show[] that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 965–66 (8th Cir. 2015) (internal quotation marks omitted).

"We recognized a substantive due process cause of action for reckless investigation in *Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001), where we identified the liberty interest at stake as the interest in obtaining *fair criminal proceedings*." *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008) (emphasis added) (internal quotation marks omitted). "To establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's failure to investigate was intentional or reckless, thereby shocking the conscience." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) (internal quotation marks omitted). "This is a question of law to which we apply a rigorous standard." *Johnson v. Moody*, 903 F.3d 766, 773 (8th Cir. 2018). "Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to the conscience-shocking level." *Davis v. White*, 794 F.3d 1008, 1015 (8th Cir. 2015) (internal quotation marks omitted).

> We have held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence.

*Winslow*, 696 F.3d at 732 (quoting *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009)). By contrast, "neither negligent nor grossly negligent failure to investigate amounts to a constitutional violation." *Davis*, 794 F.3d at 1015. "An officer's negligent failure to investigate inconsistencies . . . is insufficient to establish conscience-shocking misconduct." *Johnson*, 903 F.3d at 773 (quoting *Akins*, 588 F.3d at 1184).

"To prove a violation of their Fourteenth Amendment rights, [a] [p]laintiff[] must also show that [the] [d]efendants' reckless investigation deprived [p]laintiff[] of [his] liberty." *Winslow*, 696 F.3d at 735. We have recognized that "evidence derived from a reckless investigation only violates a criminal defendant['s] due process rights if it is 'used to deprive the defendant of her liberty in some way.'" *Id.* (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). For example, "if an officer . . . fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Id.* (ellipsis in original) (quoting *Whitlock*, 682 F.3d at 582). By contrast, we have held that where there was "evidence [d]efendants used false evidence to secure a conviction, [p]laintiffs . . . sufficiently supported a cognizable due process claim." *Id.* (citing *Wilson*, 260 F.3d at 954–55 (allowing reckless investigation claim to proceed where evidence derived from investigation was used at plea hearing)); *see also Johnson v. McCarver*, 942 F.3d 405, 411 (8th Cir. 2019) ("Any *post-trial* claim based on the alleged false report requires a showing that the report was used to deprive [plaintiff] of liberty in some way.").

Here, even assuming that Torgerson could show a reckless investigation that shocks the conscience, he has failed to show that the "reckless investigation deprived [him] of [his] liberty." *Winslow*, 696 F.3d at 735. Torgerson suffered no criminal consequences from the deputies' investigation. The deputies did not arrest Torgerson.

-10-

The record shows that Deputy Angerhofer completed a long-form investigative report in which he recorded the information obtained from the deputies' investigation and sent it to the state's attorney for determination of whether to charge anyone with a crime. Ultimately, Torgerson was never charged with nor prosecuted for any crime; therefore, he was not deprived of his liberty and suffered no violation of his substantive or due process rights under the Fourteenth Amendment.

### B. *Civil Conspiracy*

Torgerson maintains that the district court erred in concluding that no evidence existed of the defendants'[6] civil conspiracy. *See* 42 U.S.C. § 1983.[7]

> To prove a § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff. Moreover, . . . the plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim.

*Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) (citations omitted).

---

[6]Torgerson not only sued the state actors for civil conspiracy, but also Ross and Terri. "A private party may be held liable under § 1983 only if it is a willful participant in joint activity with the State or its agents." *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009) (internal quotation marks omitted).

[7]Torgerson concedes that "[t]he [d]istrict [c]ourt is correct about a conspiracy under 42 U.S.C. § 1985 that '. . . there must be some racial, or perhaps otherwise class-based, invidiously discriminating animus behind the conspirators' actions.'" Appellant's Br. at 22 (ellipsis in original) (quoting R. Doc. 67, at 7 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971))).

"In the absence of a [constitutional] violation, there is no actionable conspiracy claim." *Cook v. Tadros*, 312 F.3d 386, 388 (8th Cir. 2002). Because Torgerson's constitutional rights were not violated, his civil conspiracy claim necessarily fails.

## C. Monell *Claim*

Torgerson next argues that the district court erroneously granted summary judgment to the County on his *Monell* claim.

"'[A]bsent a constitutional violation' by a[] [County] employee, 'there can be no § 1983 or *Monell* liability." *Stearns*, 122 F.4th at 704 (first alteration in original) (quoting *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018)). Here, Torgerson's "*Monell* claim fails" "[b]ecause [his] constitutional rights were not violated." *Id.*

## D. *State-Law Claims*

Torgerson challenges the district court's refusal to exercise jurisdiction over his state-law claims.

"In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (internal quotation marks omitted). Here, Torgerson has provided us with "no reason to second guess the district court's decision, and we can detect no abuse of discretion." *Id.*

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

———————————————————

-12-